## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ORFIN, LLC

        Plaintiff,

    v.

AEYE, INC.

        Defendant.

C.A. No. 21-cv-560-CFC

## OPENING BRIEF IN SUPPORT OF
## AMENDED MOTION TO DISMISS COMPLAINT

Ronald N. Brown, III (DE Bar No. 4831)
Amy Evans (DE Bar No. 3829)
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
ronald.brown@dlapiper.com
amy.evans@dlapiper.com

-and-

Michael Fluhr (admitted *pro hac vice*)
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105
Telephone: (415) 836-2500
michael.fluhr@dlapiper.com

*Counsel for Defendant*

Dated:  July 14, 2021

# **TABLE OF CONTENTS**

CITATION CONVENTIONS ............................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ................................ 3

SUMMARY OF ARGUMENT ............................................................. 3

BACKGROUND ................................................................................ 4

    A.   The Parties ................................................................... 4

    B.   AEye Raises Money Via a Convertible Note ..................... 5

    C.   AEye and Orfin Discuss Orfin's Investment in the Convertible Note ........................................................................ 6

    D.   Orfin Files This Lawsuit .................................................. 8

ARGUMENT .................................................................................... 8

I.    The Complaint Should Be Dismissed for Failure to State a Claim ................ 8

    a.   The Allegations, Purchase Agreement language, and Nature of the Deal Do Not Raise a Reasonable Inference That the Parties Intended to Enter a Binding Contract Absent Formal Execution ........ 9

    b.   Orfin's Claim for Promissory Estoppel Must Be Dismissed Because Orfin Fails to Allege A Clear Promise or Detrimental Reliance ................................................................... 17

CONCLUSION ................................................................................ 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angelo DiPonio Equipment Co. v. State*,
  309 N.W.2d 566 (1981) ...................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................8

*Attestor Value Master Fund v. Republic of Argentina*,
  940 F.3d 825 (2d Cir. 2019) .....................................................*passim*

*Empros Capital LLC v. Rosenbach*,
  2020 WL 6684854 (N.D. Cal. Nov. 12, 2020) ......................................14, 15, 16

*Hess v. Cannon Tp.*,
  696 N.W.2d 742 (Mich. Ct. App. 2005).............................................9

*Hydrogen Master Rights, Ltd. v. Weston*,
  228 F. Supp. 3d 320 (D. Del. 2017)...............................................17, 18

*J Supor & Son Trucking & Riggins Company, Inc. v. Kenworth Truck Co.*,
  791 F. Appx. 308 (3d Cir. 2019) ..................................................5

*Klein v. HP Pelzer Automotive Systems, Inc.*,
  854 N.W.2d 521 (Mich. Ct. App. 2014)...........................................17, 18

*Leeds v. First Allied Connecticut Corp.*,
  521 A.2d 1095 (Del. Ch. 1986) ..................................................9, 10, 16

*Michigan Broadcasting Co. v. Shawd*,
  90 N.W.2d 451 (Mich. 1958)......................................................*passim*

*Novak v. Nationwide Mut. Ins. Co.*,
  599 N.W.2d 546 (Mich. Ct. App. 1999)............................................18

*Realtime Data LLC v. Kaminario, Inc.*,
  2020 WL 128767 (D. Del. Jan. 10, 2020) ..........................................*passim*

*Reyno v. Piper Aircraft Co.*,
    630 F.2d 149 (3d Cir. 1980), *rev'd on other grounds*, 454 U.S. 235
    (1981) ............................................................................................................... 9

*Shaughnesy v. Interpublic Grp. Of Cos., Inc.*,
    506 F. Appx. 369 (6th Cir. 2012) ..................................................................... 19

*Witzke v. Kent County Society for Prevention of Cruelty to Animals, Inc.*,
    2014 WL 4298210 (Del. Super. Aug. 29, 2014) ........................................ 17, 19

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 5, 8

Williston, Contracts (4th ed.), §8:4 ........................................................................ 18

## CITATION CONVENTIONS

"AEye": Defendant AEye, Inc.

"Complaint" or "Compl.":  Plaintiff's Complaint

"Decl.": Declaration

"Defendant":  Defendant AEye, Inc.

"Note": The convertible note at issue in this case

"Orfin": Plaintiff Orfin, LLC

"Plaintiff": Plaintiff Orfin, LLC

"Purchase Agreement": The draft Purchase Agreement

"Because no reasonable person would conclude based on the email exchange reproduced above that the parties intended to be bound by those emails and had reached a final agreement, the parties did not assent to a final settlement agreement and there is no contract for the Court to enforce."

-*Realtime Data LLC v. Kaminario, Inc.*, 2020 WL 128767, at *2 (D. Del. Jan. 10, 2020)

"With millions of dollars at stake, a requirement that an agreement be in writing and signed simply cannot be a surprise to anyone."

-*Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 832 (2d Cir. 2019) (quoting *R.G. Grp. Inc. v. Horn Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984)).

## NATURE AND STAGE OF THE PROCEEDINGS

Family wealth manager Orfin, LLC seeks to enforce an alleged contract to purchase a $2.5 million convertible note from automotive safety company AEye, Inc. Orfin alleges that the terms of this supposed agreement were set forth in a draft Purchase Agreement, which, as one would expect for such an agreement, included language requiring formal execution and an integration clause. AEye ultimately sold the note to other investors, not Orfin, and Orfin admits that the parties never formally executed the Purchase Agreement. Orfin nevertheless claims that AEye agreed to the Purchase Agreement via phone calls and text messages and sues AEye for breach of contract and promissory estoppel.

AEye now moves to dismiss.

## SUMMARY OF ARGUMENT

1.     Orfin's own allegations, even if accepted as true for purposes of the instant Motion, fail to raise a reasonable inference that the parties intended to consummate a $2.5 million investment through phone calls and text messages, particularly when the alleged Purchase Agreement itself explicitly requires formal execution.

2.     Orfin fails to sufficiently allege any element of promissory estoppel. For the reasons above, Orfin fails to allege a clear promise by AEye. Nor does Orfin allege any specific acts it took in reliance on any such promise. Orfin accordingly fails to allege that justice requires enforcement of the promise.

Orfin is understandably disappointed to have missed the opportunity to invest in AEye's convertible note.  But disappointment does not justify a lawsuit. The Complaint should be dismissed.

## BACKGROUND[1]

### A.    The Parties

AEye develops and sells AI-driven LiDAR systems for vehicles. *See* Exhibit 1, Declaration of Jordan Greene ¶ 2.  These systems are designed to facilitate vehicle autonomy and save lives.  *Id.*

According to the LinkedIn page of Orfin "Partner" Adam Finkel, Orfin is affiliated with a family office (a privately held company that manages wealth for affluent families) that has invested in real estate and private equity throughout North America. *See* Adam Finkel, LinkedIn, www.linkedin.com/in/adamfinkel/ (last visited Mar. 8, 2021).  Finkel claims that Orfin focuses on incubating and funding technology ventures and that it "funds deals alongside top-tier funds like Google Ventures, First Round Capital, Andreessen Horowitz, Data Collective and Kleiner Perkins." *Id.*

---

[1] The facts are drawn largely from the Complaint and the Purchase Agreement, which is referenced in the Complaint and integral to it.

## B.     AEye Raises Money Via a Convertible Note

In 2020, AEye sought to raise money by issuing a convertible note (debt which converts to stock under certain conditions) to various investors. D.I. 1, Complaint ("Compl.") ¶¶ 10-28.  The terms of the note were set forth in a Purchase Agreement.[2] Compl. ¶¶ 15-18; Greene Decl. Ex. A (the Purchase Agreement).

Several provisions of the Purchase Agreement bear on this motion. Most importantly, multiple provisions require or reference formal execution.  *See* Greene Decl. Ex. A §§1(b), 2(c), 2(d), 2(e), 2(l), 3(a), 6(l).  In particular, Section 1(b) states that after the Initial Closing, additional investors agree to purchase convertible notes "by **execution** of counterpart(s) of this Agreement." *Id.* §1(b) (emphasis added).  A signature page states that "The parties have caused this Agreement **to be duly executed** and delivered by their proper and duly authorized officers as of the date and year first written above." *See id.* at 9 (emphasis added).  Signature pages for investor signatures were to follow. *See id.* at 8.  The Purchase Agreement also provides that investments would occur separately for each investor at "closings," at which time the investor was to deliver the agreed-upon purchase price as a condition

---

[2] Orfin claims that the Purchase Agreement contains the terms of the alleged contract but does not attach it to the Complaint. Compl. ¶¶ 15-19.  Under these circumstances, the Court can consider the Purchase Agreement when adjudicating a Rule 12(b)(6) motion. *See, e.g.*, *J Supor & Son Trucking & Riggins Company, Inc. v. Kenworth Truck Co.*, 791 F. Appx. 308, 310 n.2 (3d Cir. 2019) ("We consider the Agreement in this appeal although it was not attached to Supor's complaint.").

of sale.  *Id.* at §5(d).  Lastly, the Purchase Agreement contains an integration clause. The integration clause provides that it constitutes the entire agreement between the parties and supersedes all prior communications.  *Id.* at §6(g).

### C.    AEye and Orfin Discuss Orfin's Investment in the Convertible Note

According to Orfin's Complaint, on November 23, 2020, AEye "invited" Orfin to invest $2.5 million in the convertible note.  Compl. ¶¶ 10, 11.  A week later, on November 30, 2020, AEye sent Orfin an "Investment Presentation" that "clearly described" the terms of the Purchase Agreement.  Compl. ¶¶ 15, 18; *see* Greene Decl. ¶ 3.  Orfin alleges that on an unspecified date AEye advised Orfin by phone that AEye would need a firm acceptance of this offer by December 11, 2020.  Compl. ¶ 16.

Orfin further alleges that the parties then "confirmed" the Purchase Agreement on four occasions.  Compl. ¶ 22.

- First, Orfin alleges that the parties "confirmed" the Purchase Agreement orally during a call on December 11, 2020, though the Complaint does not set forth the substance of that conversation.  *Id.*

- Second, Orfin alleges that the parties "confirmed" the Purchase Agreement by text message on December 12 and 13, 2020, though again the Complaint does not set forth the substance of those messages.  *Id.*

- Third, Orfin alleges that the parties "confirmed" the Purchase Agreement by phone call on December 14, 2020, but, again, the Complaint does not allege any of the language actually used. *Id.*

- Fourth, Orfin sets forth the substance of a December 14, 2020, text conversation, in which Finkel states "Great speaking! Thanks for helping us move forward as an investor!" and AEye Co-Founder and Vice President of Corporate Development Jordan Greene replies "Pleasure speaking as well Adam. We are excited to have you part of the AEye team." *Id.*

Although Orfin claims that the parties had entered into an enforceable Purchase Agreement for $2.5 million, it admittedly never wired the funds, as required to consummate the transaction. *Id.* at ¶ 4.

Orfin claims that ten days "after the parties[] entered into the Purchase Agreement" AEye indicated it would no longer sell Orfin the note unless Orfin also agreed to make another investment. *Id.* at ¶ 24.  Orfin allegedly objected.[3]  *Id.* ¶ 26.

---

[3] AEye does not agree with these characterizations.  Orfin does not quote or mention subsequent text messages from Orfin partner Adam Finkel to AEye co-founder Jordan Green.  Should this case proceed past the pleadings, the evidence would show that these include the following: "[C]an we still possibly invest $2.5mm in the note as discussed" (Dec. 27); "Any updates on the PIPE/note investment opportunity" (Dec. 30); and "So what is the most we could possibly take in the note?" (Dec. 31). AEye does not ask the Court to take notice of these messages for this motion challenging the pleadings and includes them only to clarify its opposition to Orfin's characterizations.

### D.     Orfin Files This Lawsuit

Based on the allegations above, on February 24, 2021, Orfin filed this lawsuit against AEye in the Circuit Court for the Third Judicial Circuit of Michigan.  Notice of Removal, D.I. 1 (attaching Complaint).  Orfin asserts claims for breach of contract, for which Orfin seeks damages or specific performance, and promissory estoppel.  *Id.*  On March 25, 2021, AEye removed the case on grounds of diversity jurisdiction.  *Id.*  On April 21, 2021, this case was transferred to the District of Delaware pursuant to the Agreement's Delaware forum-selection clause.  D.I. 7, 8.

AEye now moves to dismiss the Complaint.

## ARGUMENT

## I.     The Complaint Should Be Dismissed for Failure to State a Claim

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.*  On a Rule 12(b)(6) motion, the Court must accept all allegations as true.  *Id.*  That said, threadbare recitals of the elements of a claim, supported by mere conclusory statements, do not suffice.  *Id.*

### a. The Allegations, Purchase Agreement language, and Nature of the Deal Do Not Raise a Reasonable Inference That the Parties Intended to Enter a Binding Contract Absent Formal Execution

Under the law of both Michigan and Delaware, a contract requires mutual intent to be legally bound.[4] *See, e.g.*, *Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986); *Hess v. Cannon Tp.*, 696 N.W.2d 742, 748 (Mich. Ct. App. 2005).  It is this mutual intent that separates nonbinding preliminary negotiations from a legally enforceable contract. *See Leeds*, 521 A.2d at 1101-02; *Michigan Broadcasting Co. v. Shawd*, 90 N.W.2d 451 (Mich. 1958).  In evaluating whether parties have engaged in mere preliminary negotiations or have intentionally entered a legally enforceable contract, courts look to a variety of surrounding circumstances, including the course and substance of the negotiations and customary practice in the industry. *See Realtime Data LLC v. Kaminario, Inc.*, 2020 WL 128767, at *2 (D. Del. Jan. 10, 2020) ("To determine whether a contract exists, the Court looks to whether a reasonable man would, based upon the objective

---

[4] Orfin is a Michigan LLC and originally sued in Michigan.  But the Purchase Agreement is governed by the laws of Delaware, and AEye maintains it is not subject to personal jurisdiction in Michigan.  Under these circumstances, AEye submits that the laws of Delaware should govern Orfin's breach of contract claims.  *See Reyno v. Piper Aircraft Co.*, 630 F.2d 149, 165 (3d Cir. 1980) (reasoning that where a state's "exercise of jurisdiction over [a defendant] would violate due process, so would application of that state's choice of law rules"), *rev'd on other grounds*, 454 U.S. 235 (1981). In any case as discussed below, the laws of Delaware and Michigan are in accord on this issue.

manifestation of assent and all of the surrounding circumstances, conclude that the parties intended to be bound by contract."); *Leeds*, 521 A.2d at 1102-03; *Shawd*, 352 Mich. at 456-57.

This analysis makes manifest sense. Negotiations typically proceed over time with agreements on some points being reached along the way towards a complete negotiation. *Leeds*, 521 A.2d at 1101. Agreements made along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional and tentative. *Id.* Negotiation of complex, multi-faceted commercial transactions could hardly proceed in any other way. *Id.* In general, parties must be free to discuss and explore a potential relationship without fear that they will be unreasonably held to a legal obligation they did not intend. *See Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 830 (2d Cir. 2019) ("The point of these rules is to give parties the power to contract as they please, so that they may, if they like . . . maintain complete immunity from all obligation until a written agreement is executed.") (quotations and citations omitted).

This Court recently addressed a similar situation in *Realtime Data LLC v. Kaminario, Inc.* and held the parties in that case had not entered an enforceable contract. *Realtime Data*, 2020 WL 128767. There, plaintiff Realtime Data sued defendant Kaminario for patent infringement. *Id.* at *1. Realtime Data filed a motion to enforce an unexecuted draft settlement agreement that Realtime Data

alleged the parties had entered via emails. *Id.* at *1.  In various emails, Realtime Data indeed had agreed to a version of a draft settlement presented by Kaminario, though other emails included discussion of edits and future execution. *Id.* at *1-2. This Court denied Realtime Data's motion, holding that "no reasonable person would conclude based on the email exchange . . . that the parties intended to be bound by those emails and had reached a final agreement." *Id.* at *2.  The Court found, among other things, that the emails at issue evidenced nonbinding negotiations despite statements by Kaminario that "I'd like to make sure these changes are acceptable to you.  If so, I think we're done" and "[p]erhaps we just file a notice [with the Court] that the parties have settled." *Id.* at *2.  The Court further reasoned that "the proposed agreement between the parties includes a signature page, confirming that the parties intended the agreement to take effect only when a written version of it was signed and dated." *Id.*

While AEye maintains that Delaware law should apply to this matter, the law of Michigan is in accord.  In the seminal case of *Michigan Broadcasting Co. v. Shawd*, the Michigan Supreme Court affirmed dismissal of claims for breach of contract under circumstances similar to those alleged here. *Shawd,* 90 N.W.2d 45. Plaintiff Michigan Broadcasting alleged that defendant Shawd breached an agreement to sell to Michigan Broadcasting all shares of a radio station.  90 N.W.2d at 452-54.  Plaintiff further claimed that the parties had agreed in person on a

purchase price of $225,000, mutually declared that "it was a deal," and had an attorney draw up a written agreement that plaintiff claims reflected the final agreement. *Id.* Nevertheless, a chancellor dismissed the complaint, finding no enforceable agreement, and the Supreme Court affirmed. *Id.* at 454-56. The Court reasoned that the negotiations and underlying substance of the deal were complex, the parties had drawn up a draft contract, the involved value was high, and the agreement was of a class usually found in writing. *Id.*; *see also Angelo DiPonio Equipment Co. v. State*, 309 N.W.2d 566, 568 (1981) ("The trial court further found that since defendants manifested an intent not to be bound until the execution of a written or formal contract, no valid and enforceable obligation arose. We agree.").

Although the inquiry into the parties' intent is fact-specific, where the only reasonable inference from the pleadings is that the parties did not intend to be legally bound absent formal execution of a written agreement, courts have dismissed claims for breach of contract at the pleading stage. In *Attestor*, defendant Republic of Argentina defaulted on bond obligations and sought to settle with certain bondholders. 940 F.3d at 827. Republic published a settlement agreement with instructions on how holders of defaulted bonds could accept, specifically by completing an agreement schedule specific to their holdings. *Id.* at 828. The agreement contained additional language contemplating formal execution, including a statement that the "Agreement Schedule, when countersigned by the Republic,

12

shall constitute a binding agreement." *Id.* Plaintiffs, five holders of defaulted bonds, each sent Republic a signed agreement schedule, but Republic did not countersign and instead informed plaintiffs it would not agree. *Id.* at 829. Plaintiffs sued Republic seeking a declaratory judgment that they had entered binding agreements, but the District Court for the Southern District of New York dismissed without leave to amend, and the Second Circuit affirmed. *Id.* at 829-30. The court reasoned that the proposed settlement agreement contained ample language contemplating formal execution as a prerequisite to enforceability, that neither party had performed, that the unexecuted settlement left open the terms of the bonds covered, and that this was the type of agreement typically requiring a signature. *Id.* at 830-32.

Here, Orfin alleges that AEye manifested an intent to sell Orfin a $2.5 million convertible note from AEye during phone calls and text messages, the last of which read "[w]e are excited to have you part of the AEye team." Compl. ¶ 22. But the undescribed content of the two phone calls and first text message provide no support for Orfin's conclusory allegation, and the latter text is at most a friendly comment and does not alone plausibly demonstrate intent to be legally bound under the circumstances. *See Realtime Data*, 2020 WL 128767 at *2 (statements that "I'd like to make sure these changes are acceptable to you . . . [if] so, I think we're done" and "[p]erhaps we just file a notice that the parties have settled" insufficient to show intent to be bound to settlement agreement); *Shawd*, 90 N.W.2d at 453-54 (statement

"it was a deal" insufficient); *Empros Capital LLC v. Rosenbach*, 2020 WL 6684854, at \*7 (N.D. Cal. Nov. 12, 2020) (email stating "Good evening, we are thrilled to have you be a part of our fund" insufficient).

Rather, the Purchase Agreement contemplates formal execution as a prerequisite to enforceability. Section 1(b) states that after the Initial Closing, one or more additional investors—such as Orfin—agree to purchase additional convertible notes "**by execution** of counterpart(s) of this Agreement." Greene Decl. Ex. A §1(b) (emphasis added). The Purchase Agreement provided for investor signatures. *See id.* at 8. Numerous other provisions confirm the requirement of formal execution. *See* Greene Decl. Ex. A §2(c) (AEye warrants that "**execution**, delivery and performance" of Purchase Agreement within its power) (emphasis added); §2(d) (AEye warrants Purchase Agreement executed or to be executed by AEye has been or will be duly executed and delivered); §2(e) (AEye warrants execution and delivery does not violate company laws); §2(l) (AEye warrants it has authority to execute and deliver); §3(a) (investor warrants it has authority to execute and deliver); §6(l) (Purchase Agreement may be executed in counterparts). The draft Purchase Agreement alone precludes any reasonable inference that the parties intended to be bound absent formal execution. *See Realtime Data*, 2020 WL 128767, at \*2 ("Indeed, the proposed agreement between the parties includes a signature page, confirming that the parties intended the agreement to take effect only when a

14

written version of it was signed and dated."); *Attestor*, 940 F.3d at 830 ("[I]ndications in the proposed settlement agreement that the parties did not intend to bind themselves until the settlement had been signed must be given considerable weight") (quotations omitted); *Emprose Capital*, 2020 WL 6684854, at *6 ("It is evident from these repeated statements across two of the three documents that required signature that the parties intended any contract to be complete only upon proper execution through signing.").

Also, the Purchase Agreement contains an integration clause, providing that it constitutes the entire agreement and supersedes all prior communications, preempting any claims that the Purchase Agreement also includes oral or other written representations, as Orfin alleges. *Id.* at §6(g).

Besides the text of the Purchase Agreement itself, Orfin's own allegations preclude any reasonable inference that the parties intended to enter an enforceable agreement without formal execution. The Purchase Agreement requires at closing that each investor deliver to AEye the agreed-upon purchase price and indeed makes this a condition to any obligation by AEye. *Id.* at §5(d). Orfin acknowledges it never did so and claims instead that it performed its obligations "by committing to pay AEye $2.5 million." S*ee* Compl. ¶ 4 (alleging that the funds "were to be wired"); Compl. ¶ 33 (alleging that "Orfin tendered performance of the Purchase Agreement by committing to pay AEye $2.5 million"). These allegations fall flat, however, in

light of the specific requirement of actual payment before any contractual obligations are triggered. S*ee Attestor*, 940 F.3d at 831 (failure to make payment under disputed contract weighs against its existence).

More generally, it transcends credulity to claim that the parties would have intended to commit themselves to a complex, $2.5 million transaction for a note convertible to AEye stock without executing formal paperwork required of every other investor. *See Leeds*, 521 A.2d at 1102-03 ("Moreover, while it is surely possible to make a binding contract to sell a $3.5 million business, including real estate, on a single page, it would be extraordinary to do so. Absent a clear indication that the other party intended that unusual course, a reasonable commercial negotiator . . . could not conclude in these circumstances that that was intended."); *Shawd*, 90 N.W.2d at 456 ("The [facts that the] involved value and amount was something out of the ordinary, and the agreement toward which the parties were proceeding was 'of that class which are usually found to be in writing' . . . unitedly stand as 'some evidence that the parties intended it (a writing) to be the final closing of the contract.'"); *Empros Capital*, 2020 WL 6684854, at *6 ("[T]he requirement of formal execution makes particular sense in light of the complexity of the transaction"). It is vital to such transactions that parties can negotiate without fear of being legally bound absent a clear indication and intent to do so. *See Empros Capital*, 2020 WL 6684854, at *6 ("The requirement of formal execution . . .

16

removed uncertainty over whether a contract had been formed by imposing a bright-line rule in the plain language of the contract.").

Orfin holds itself out as a sophisticated investor. As such, surely it is aware of the importance of an executed agreement before any investment is finalized. As the Second Circuit recently put it: "[W]ith millions of dollars at stake, a requirement that an agreement be in writing and signed simply cannot be a surprise to anyone." *Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 832 (2d Cir. 2019) (brackets and citation omitted).

No matter how desperate Orfin is to invest in AEye, it has failed to plead the existence of a contract, and its claim for breach should be dismissed.

### b. Orfin's Claim for Promissory Estoppel Must Be Dismissed Because Orfin Fails to Allege A Clear Promise or Detrimental Reliance

The elements of promissory estoppel are: (1) a promise was made; (2) the promisor reasonably expected to induce action or forbearance by the promise; (3) the promise reasonably relied to its detriment; and (4) injustice can be avoided only by enforcing the promise. *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 333 (D. Del. 2017); *Witzke v. Kent County Society for Prevention of Cruelty to Animals, Inc.*, 2014 WL 4298210, at *2 (Del. Super. Aug. 29, 2014); *cf. Klein v. HP Pelzer Automotive Systems, Inc.*, 854 N.W.2d 521, 530 (Mich. Ct. App. 2014). The element of reliance substitutes for consideration, and promissory estoppel avoids the injustice of forcing plaintiff to bear the costs of its reliance on the promise. *See* 4

Williston, Contracts (4th ed.), §8:4 ("[C]ompelling reasons of justice exist for enforcing some promises solely on the basis of the promisee's reliance, when injustice cannot otherwise be avoided, when the promise had led the promisee to incur **any substantial detriment** on the faith of it, and when the promisor not only intended the reliance, but also should reasonably have expected that it would occur.") (emphasis added).  Promissory estoppel should only be applied when the facts are unquestionable and the wrong to be prevented undoubted. *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999) (affirming dismissal of promissory estoppel claim based on alleged oral promise contradicted by integrated contract).

Orfin alleges that AEye promised to sell Orfin the convertible note, but Orfin's allegations fail to establish any of the elements of promissory estoppel.  For the reasons set forth in the previous section, the allegations preclude any reasonable inference of a clear and definite promise.  *See Klein*, 854 N.W.2d at 530 (dismissal of promissory estoppel affirmed where no clear promise).  Furthermore, while Orfin alleges that AEye's alleged promises induced "reliance and/or forbearance by Orfin of a definitive and substantial nature," the Complaint contains no factual allegations to support this bare legal conclusion.  Compl. ¶ 53; *see Hydrogen Master Rights*, 228 F. Supp. 3d at 333 (dismissing claim because the complaint "does nothing more than provide a formulaic recitation of the elements of promissory estoppel");

*Shaughnesy v. Interpublic Grp. Of Cos., Inc.*, 506 F. Appx. 369, 378 (6th Cir. 2012) (affirming dismissal of promissory estoppel claim because "this Court has no basis to believe that Defendant otherwise induced Plaintiff's reliance"). Orfin alleges no specific actions it took or refrained from taking in reliance on any alleged promise by AEye. *Witzke*, 2014 WL 4298210, at *2 (dismissing promissory estoppel claim on the pleadings because "plaintiff fails to provide action or inaction that he did in reliance of his supervisor's promise"). Orfin thus also fails to allege that AEye should have reasonably expected any such actions. Nor has Orfin alleged that it incurred any specific, actual costs of detrimental reliance for which justice requires compensation. Promissory estoppel is wholly inapplicable.

## CONCLUSION

Orfin's disappointment of missing the opportunity to invest in AEye does not justify a lawsuit. The Court should dismiss.


Dated: July 14, 2021            **DLA PIPER LLP (US)**

                                 */s/ Ronald N. Brown, III*
                                 Ronald N. Brown, III (DE Bar No. 4831)
                                 Amy Evans (DE Bar No. 3829)
                                 1201 North Market Street, Suite 2100
                                 Wilmington, Delaware 19801
                                 (302) 468-5700
                                 ronald.brown@dlapiper.com
                                 amy.evans@dlapiper.com

                                 -and-

Michael Fluhr (admitted *pro hac vice*)
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105
Telephone: (415) 836-2500
michael.fluhr@dlapiper.com

*Counsel for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief complies with the Court's standing order regarding briefing in all cases. The brief has been prepared using 14-point Times New Roman font and contains 4,201 words, excluding the cover page, tables, signature blocks, and certificates.

*/s/ Ronald N. Brown, III*
Ronald N. Brown, III (DE Bar No. 4831)
